Before we begin our cases this morning, one of our panel members has a motion, so I will turn to Judge Chan. Yes, ma'am. Thank you. Chief Judge Post, thank you. I wish to make a motion today. It's my honor to move the admission of Christopher Y. Chan, who is a member of the bar and in good standing with the highest court of California. If I could just take a few moments. Last August, on Monday, August 5th, 9 a.m., I was sworn in to be a colleague of yours on this court, and my first official act was to hire Chris. So I have a particular kinship with him as employee number one for me, and over the past 11 months, it's been a lot of fun, but it's also been a bit of a chaotic rookie campaign. And Chris, luckily, thrives on chaos. So it's been a tremendous experience for me, and I know that with his intellect and his abilities, his character, moral fiber, that he'll be a success anywhere. I think he'll be a great addition to our bar, and wherever Chris goes, I know that's where the fun will be. So I have knowledge of his credentials, and I'm satisfied that he possesses the necessary qualifications. I was going to say, it's shocking that you've only been here 11 months. It feels like a lifetime. Indeed. We enthusiastically grant the motion. We stand and raise a right hand. Do you solemnly affirm that you will report yourself as an attorney and counselor of this court, and that you will support the Constitution of the United States of America? I do. Congratulations. Welcome to the bar. Our first case this morning is 13-1683, Wireless Inc. Corporation v. Google. Mr. Hitchcock. We are ready. May it please the court. I'd first like to talk about, there are two patents that were, the cases were filed slightly different times, and I'd first like to talk about the 342 patent, which was actually the later patent issued, and it's the subject of 1683. There's a subtle rewrite of the claim language that is being advanced by the appellees, and that was adopted by the district court, which is incorrect, and which we believe constitutes error. You can find it explicitly on pages 55 and 56 of the appellees' opposition brief. And in it, they try to rewrite the claim language, which requires a mobile website to receive data, as mobile web pages to receive data. And that's an important distinction here, because the appellees and the appellants both agreed at the district court level that a website includes all the associated databases, scripts, and other things that are used to support the website, to display the information that you find when you go there in a web browser. And that's the first fundamental error, that the court held that the website didn't receive external, didn't receive data from external data sources, because the web page received data from internal databases. But that's not really the point. The point is that the website itself receives data from external data sources when that data is uploaded into one of the supporting databases. But here's the problem. You say your construction that you asked for is, quote, data becomes part of a website, including a mobile website, at the moment when data is uploaded to and thus exists on the servers designed to serve content to the pages. I guess that's not the exact construction you asked for, but that's the way you describe it on page 19 of your brief, the quote from your brief. Yes, Your Honor. And my problem with that is I can't imagine defining a website as every piece of data that exists on the server that happens to host the website, because a server could host a million different websites, right? And so every piece of data that just simply happens to be uploaded to that server can't possibly be construed as included on a particular website. Well, I think, Your Honor, two points to that. One is both parties, I believe, agreed that you had to have an associated database. So in other words, just because a database existed on the same server, it wouldn't mean that it was a database that was part of the website just because some page was also being generated on the server. And the second point I would make is that that's sort of exactly the point of these huge websites, which is that they store tons of data that isn't being used all the time on the web pages. It's only in response to a request that it's, you know, one of these millions of pieces of data is drawn from one of the associated databases. And it could be on the same server or it could be on two. But isn't a website what you see when you click on that website? It isn't. A website is all the information that's being used to display what you see when you go to a particular web page. And a website can consist of thousands of web pages. But the website also includes the web page itself, right, or web pages itself. Yes, Your Honor. I would agree with that. The web pages are part of the website. And the mobile website doesn't exist until you request the website and then the web pages get generated, right? I don't agree with that. The mobile website exists before a request is made. And all the pieces of it have to be in place. It has to be programmed to work in a certain way so that when a request is made by a person's computer for a particular page that the server can then return the appropriate data to be displayed by the browser. I thought we just agreed, though, that the mobile website includes the web pages. It does, Your Honor. And the web pages don't exist. They aren't visible. They're nowhere until you actually request the generation of those web pages. Well, the HTML and other languages, all of that code exists before a request is ever made. The particular pieces may be filled in dynamically, but the page itself exists before it's ever requested. It can be a template or any number of different driven technologies, but the website itself exists and must exist before it's ever requested or you couldn't display anything on a browser. I would also, I guess, note that the notion that the website was drawing from external data sources when generating the pages isn't supported at all by the specification. And, in fact, appellees argued that this construction rendered the patent claims invalid because of a lack in the specification for any support for this construction. But I still, I guess I'm still troubled by how a website includes data uploaded to a server that has yet to be incorporated at all into the site or any of the pages on the site. It's there and available. It could be incorporated if certain steps were taken to employ it, but when it hasn't yet been incorporated, how is it at that point still to be considered part of the website? Well, but it is incorporated. At the point where it's uploaded, all the pieces are in place for it to be displayed in response to a request. That has to occur before any page can be generated, and that's exactly what the appellee's experts… But if I give my kids a bag full of blocks, the blocks aren't a house until they build a house with the blocks. So just a bag full of blocks isn't the house. And so a server with a database isn't in and of itself a website until it's incorporated the database into a website and web pages, right? I mean, that's the problem I'm having. If you want to say that these unintegrated pieces are nonetheless part of the final product even though they've yet to be built. Well, all of the programming, they have been built. The house has already been built, Your Honor, in your analogy, and the bricks are already standing in the wall. The house has already been built. Okay, I get it. You're right with my analogy. The problem is you just dumped a boatload of bricks on my driveway, and now you want to claim they're part of the house even though they haven't been incorporated into the structure of the house yet. Well, I think… I want to get my analogy closer to what your actual facts are. I understand, and I'll try to do my best, Your Honor. If you consider the house to include all the component rooms, for example, and you incorporate a piece of furniture into one of those rooms, even if you're not sitting in that room, even if you're not in the living room, even if you're not looking at the couch or whatever piece of furniture you want to use in your analogy to this piece of data, it's still inside the house. Your house was designed to hold furniture. This piece of furniture was designed to be used in your house. And it's an even stronger case when you're talking about a website because unless you draw that association between the data source and the webpage, it can't be displayed. It has to be done in advance. And there's no reason in the patent given for an interpretation of it that would require the webpages to be going out and getting from an external data source. In fact, it would be inconsistent with Claim 9, which is a dependent claim, which specifically contemplates uploading or copying data from one of these external data sources to the server. I don't know if I've answered your analogy question or not. No, you have. I'm just not sure I'm convinced. I mean, I understand your answer. The problem I'm having is I don't think that the data in the associated data database is like the chair in the house. I think it's more like the bricks on the front yard. And that's the problem I'm having. I mean, probably everybody in this room has an understanding of the term website. It's not really a super-duper complicated term. And I just imagine that expanding that definition to say everything in a database, which is uploaded to the server, which is associated with the website. That's what you're saying now. That's not the definition that you asked us for in your brief. You didn't say it is limited to material in a database associated with the website, by the way. You said anything uploaded to the server. Well, no. I believe the exact construction does have the associated language in it. Where is it? Show me. Certainly, Your Honor. I think if you look at page 20 of our brief. Okay. You say associated file scripts and databases supported by one or more of the servers. Right. So anything in any file associated with the website by one of the servers. Well, couldn't those files contain a million different things that are never, ever made part of any of the webpages, never tagged, never utilized? It's possible, although it's unlikely. It's much more likely that data will only be used on occasion. So, for example, with most websites, if you're talking about something where you have millions of pieces of data, pictures, whatever it is that you're looking at, only at certain times will a picture be displayed on a webpage. But the pictures that are uploaded to the servers are always part of the website. They're always ready and they're there to be used at any time when a person requests it. There's no special process that has to be undergone in order to go out and get that data again. It's already part of the website. And that's, in a way, the whole point of the 342 patent, which is to allow you to use one website, a content management website, to designate an external data source and make it part of this mobile website automatically, not requiring the user to do anything in order to make it part of the mobile website. I'm nearing to your rebuttal time, so... I'll reserve it. Thank you, Your Honor. Mr. Rosendahl. Chief Judge Preston, may it please the court, the district court. The district court correctly granted summary judgment of non-infringement on both the 342 and the 983 patents. And I'd like to start by saying why it is that the accused products don't infringe either of the patents in suit. With regard to the 342 patent, in order to infringe, one needs to generate a mobile website that is configured so that it will automatically receive data from an external source designated by the user at the content management website. And in this context, the claim itself tells us that an external source is one that is external from the content management website. It's separate from the content management website. In the accused products, however, it is undisputed that the mobile website is configured to receive data exclusively from internal sources and not from any external source. The mobile websites get their data only from what is being called the content management website, if you will, in this theory of infringement. Because they're not configured to receive data automatically from any external source, the accused products just don't have the kind of mobile website that's called for in the claims. I guess the other side is trying to say that if we understand the website to encompass internal servers, then the website, as defined that way, would be receiving data from an external source, right? Well, one thing that everyone agrees on is that, as the panel noted in questioning Wireless Sinks Council, is that a website has to have web pages. And indeed, the claim itself speaks about generating a mobile website. It's a method claim, so you have to generate a mobile website. And that mobile website has to be configured so that it will receive data automatically from an external source. And in this context, the only way to make sense of generating a mobile website is to generate the pages that can be seen in response to a request from a browser. And so one needs to have a set of web pages that is configured so that it will receive its information from someplace other than the servers associated with the content management website. And we just don't do that, and that's an undisputed fact in the record, and therefore summary judgment of non-infringement was appropriate. Technologically speaking, how would an accused product be able to infringe this claim if it's not running it through the server? Well, one could configure the mobile website. I think that there's a – and the problem with the theory of infringement that's being advanced here is that there's a distinction in the patent between uploading content to the content management server, which is then used to generate the mobile website on the one hand, and configuring the mobile website so that it will receive data from some external source on the other hand. So in other words, if you – You just described the inventions in the two different patents. The former, what you just said, sounded more like the 983 invention, and then the latter sounded more like the 342. Well, I think that the specification of the two patents is virtually identical, of course, and so the possibility of uploading data is, of course, accounted for in the 342 patent. Claim 9 of the 342 patent is not a species of Claim 1. It is an additional requirement, and it indicates that receiving data automatically, as shown in Claim 1, has got to be something different from uploading that's described in Claim 9. And one can imagine that there were types of data that one would prefer to have more fresh, if you will. One could imagine that one would want to configure a mobile website so that it would, for example, go and get current sports scores, or that it would go to some external source and get some article of news, or that it would, if you had a document – The sale price for shoes at Nordstrom? The sale price for shoes at Nordstrom, perhaps. The sports analogy was only working on one of the three. But the point is that in the accused products, you can't do that. The evidence is absolutely clear, and the record is undisputed, that all you can do is upload. And so if I upload the current price of shoes at Nordstrom on my Facebook page, whatever I pasted there is going to stay there, and the page is never going to go back. The mobile website is never going to go look to an outside source to see if that has changed or updated. And that's why there's no infringement. I am prepared to talk about the 983 patent if the court has questions about it. I would say in a nutshell that the claims of that patent require that there be a content management website having on it a list of selectable, predetermined mobile information channels together with indications of whether those channels have or have not been activated by the user. And then on the mobile website, there needs to be a set of links that corresponds to those predetermined selectable channels that have been selected for activation by the user. And the record is clear that none of the accused products have that. And indeed, when Wireless Inc.'s expert was asked repeatedly at her deposition to identify a content management website having a list of predetermined mobile information channels together with indications of whether or not they have been activated, she said that she did not look for that. And so the district court found correctly that there was an utter and complete failure of proof on the infringement case for the 983 patent. This is not even something that really depends on a claim construction issue. There simply was a complete failure to put forward anything in the record on any construction that would show that limitation to be satisfied. What about the screenshots? Well, there were certain screenshots that were included in the expert report. There were a few of them. And they were with regard to Google products, they were some of the same ones that appear in the Wireless Inc.'s brief. With respect to the Facebook products, the screenshots that were included in the brief were not in the expert report. They were not disclosed. And indeed, some of this is also true of some of the... Which screenshots are you saying are not included in the brief? I'm not sure which brief you're talking about. I'm referring to the brief before this court on appeal. There are eight screenshots in the opening brief. And then 180 in the reply, yes. And then 180 in the reply. The ones that are... They're not all. But the point is that the ones that were in the opening brief... Five of them weren't before the district court. Weren't before the district court. And they represent an entirely different theory of infringement on an entirely different product. It's a completely different story than what was told to the district court. And that's why it's not properly before this court on appeal. And did the district court actually find that the remaining three screenshots, the ones that were before in one summary judgment, didn't actually show at all the accused element? That's absolutely right. So if we look at the screenshots that were provided, the theory of infringement that was advanced before the district court was that the type of... So for Google Docs, which was the only product for which screenshots were provided, there was nothing on Google Pages. There was nothing on YouTube. The only shots that were provided, the theory was that when I go to Google Docs and I choose to provide, I choose to create a particular kind of document, like a presentation or a spreadsheet or a word processing document, that that list of possible documents would be the predetermined set of mobile information channels. And so what you would need to have then would be some screenshot somewhere that had that list of types of documents together with an indication as to whether or not they would be visible at the mobile website. And then you would have to show a mobile website that had a listing, that had links corresponding to the types of documents that were created. And that's just not the way it works. What you have instead is, on the mobile website, you simply have documents that were created if they were created. There are no links that correspond to the possible types of documents. And similarly, on the content management website, there's nothing that corresponds to the mobile information channels. There's nothing that suggests whether particular types of documents will or will not be... There's no web page listing of the predetermined mobile channels with respective indications of whether any of those predetermined channels have been activated. Correct. There needs to be a listing of the channels together with an indication whether they are or are not activated. And that's what's missing. They have yet to point to anything that would satisfy that limitation. The district court... The three screenshots that were before the district court you think unequivocally don't show that. I'm wondering if there's a question of fact in the district court's conclusion that they didn't demonstrate the elements present. Well, no, because the screenshots, it's apparent... Page 46, 48, and 50 of the Blue Brief, if that helps you. So, page... Page 46 of the Blue Brief is a screenshot that asks when one is creating a Google Plus page, what category of page one is creating. For example, is one a business, is one a club, is one an arts organization? The only effect of that selection is that when the page is created, it will have a tag on it that will say if it's a business or if it's a club or if it's an arts organization. So, there's nothing here on this website that would indicate whether... In the categories, mobile information channels, there's nothing that would indicate whether these channels will be visible as channels, that there will be links to channels on the mobile site. There's no indication on this page. If we turn to... They limit the scope of the audience, right? Any Google user, users 18 and older, users 21 and older. I'm looking at page 46, the screenshot. Yes, there is an audience selection... There is an audience selection option. The audience selection, though, will apply to the page that's being created. It doesn't apply to the category, which is the thing that they've identified as the predetermined list of mobile information channels. And in addition, the selection of an audience is something different from activating a mobile information channel to determine whether it will or won't be visible at a mobile site. The question of whether this is going to be on a mobile site... In other words, the audience selection, it doesn't matter whether I'm at a mobile site or I'm at some other site. There's simply some categories of content that I choose to make available to some people and not to others. That's a different principle than the question of creating mobile information channels that will be used as an organizing principle at a mobile site. The language make visible. Is it okay if I translate that language in my head to mean turn on, turn off? Or is that not right? Well, I think it's fair to say turn on, turn off. The claim itself, though, explains what the consequence of turning on the channel is. And the consequence is that the channel that you turn on will have a link at the mobile website that corresponds to it. And we see that it's written into the claim itself. The three limitations were added. And if the court wishes to see where they were added, they were added at page 5977 of the Joint Appendix. And then the effect of the amendments were described at pages 5935 of the Joint Appendix and pages 5982 and 83 of the Joint Appendix. And in those spots, the limitations that were added were the ability to select activation of the channels, the page at the content management site that shows the indications and the listing of the channels, and then at the mobile site, a web page having activatable links corresponding to the respective ones of the predetermined selectable mobile information channels. Is there any relevance to the argument that if I read this as I should, in summary judgment with all inferences in favor of the non-movement, that this discloses a channel and an indication, but not channels and indications plural as the claim requires, that this screenshot may show a singular satisfying event, but not that there exist multiple channels and indications? Because the claim is in the plural. Well, the claim is in the plural. And I think the claim indicate respective indications of whether or not said channels have been activated. It's pretty clear that you need to have a plurality of channels, and you need for each channel to have an indication of whether or not it's been activated. So even if one were to construe this as an indication, I don't, that wouldn't satisfy the claim. But more to the point, this just doesn't, this listing of categories just doesn't fit the description of a mobile information channel. Because there's nothing on the mobile website that corresponds to this listing that's been, if we can say that there's a way to figure out whether it's been turned on or not turned on. I would like to quickly just tick off the other couple of screenshots so that there's no question about whether there's anything in the record on this point. But I think you will find that none of them has the limitation that the district court found was missing. Namely, there's no indication of something that could be called a mobile information channel together with indications whether that channel is turned on or not turned on. I'm sorry, I'm just having trouble getting to the pages again. In short, the district court did a thorough searching of the record and in a careful and thoughtfully reasoned opinion, explained why the particular kind of content management website and the particular kind of mobile website called for in the claims are not present in the accused products. Because the district court's claim constructions are fully supported by the record and there was a complete failure of proof of infringement on the part of Wireless Inc., the summary judgment should be affirmed. Thank you. So I guess I'll use my rebuttal time to speak about the first patent, the 983 patent. First of all, there's a fundamental claim construction error that permeates this claim which uses activation, activated, and activatable on the same claim. And the appellants have to concede that they're going to construe those terms differently as not being the same root, activate. And the specification, so first of all, the ordinary meaning of activate or activation doesn't mean made visible. And it's never defined. What we spent most of our time on actually doesn't seem to have been the construction. I understand from your brief, your arguments on the construction, it was whether under any construction you had offered any evidence that this claim element was satisfied that would have precluded summary judgment. And there really were only three screenshots presented. And so you want to go through those and show us how under any construction at all this would – I'll assume your construction for purposes of this argument. Show me how it would be satisfied in terms of proof by the screenshot. I understand, Your Honor. If you change the construction of activation from made visible to operating, then I would say that these screenshots along with the expert report certainly show that a person could operate more than one mobile information channel, that there were indications of whether or not that mobile information channel had been operated on the content management website, and that there are links that correspond to any channel that's been used or operated. I don't understand. Show me how 46 does all that. Okay. Screenshot on 46. You're in the blue brief, Your Honor? Yep, I'm in your blue brief. Honestly, I don't give much weight to your expert testimony. I thought his statements were conclusory, didn't cite any screenshots. So your best bet with me is showing me how the only evidence you actually produced in the form of evidence actually meets that limitation as you'd like it construed. Okay. Well, and because I have limited time, I'll also say the following. I don't think this argument was actually raised on summary judgment. If it had been, our expert took 700 screenshots of these public websites and went through very thoroughly to confirm the opinions in our expert report. Had this argument been raised as it was in the motion for attorney's fees, we would have attached the hundreds of pages here. Appellees argued in their summary judgment brief at page 18 and 19 that you had introduced no evidence showing they practiced this claim limitation. They did not say there was a failure to support this particular element anywhere. I mean, they threw up, if you read their brief, and if you believe that they specifically made this argument, then I have to admit I just made a mistake because I didn't think they were raising this or I would have attached the hundreds of pages of screenshots that our expert took in order to confirm all of these claim limitations. But even if, I mean, if you change the construction of the core terms of activation and activatable and activated the way we propose, I don't think it's fair to say that, well, your expert didn't support that alternate construction in her report as well. Claim construction had already occurred. She assumed, as I think almost every expert does, the construction of the court was going to be what was relevant at trial, so she didn't go through and put proof down for alternate constructions, and I don't think most experts do that at the district court level. I'm over my time. I apologize. Thank you. We have the argument. We thank the counsel for cases.